IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NICOLE MOORE, ) | |
| ) | |
| Plaintiff, ) | CV 08-6258-TC |
| ) | |
| v. ) | FINDINGS AND |
| ) | RECOMMENDATION |
| MICHAEL J. ASTRUE, Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |

COFFIN, Magistrate Judge:

Plaintiff Nicole Moore challenges the Commissioner's decision denying her application for disability insurance benefits under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner's decision should be affirmed.

Moore initially alleged disability beginning January 17, 2001, the date she was terminated from her last job for excessive absences. Admin. R. 76, 98. She later amended the alleged onset of disability to April 12, 2004. *Id.* at 18, 70, 162. Moore met the insured status requirements for a

1 - FINDINGS AND RECOMMENDATION

claim under Title II of the Social Security Act through September 30, 2005. *Id.* at 18, 67. Moore must establish that she was disabled on or before that date to prevail on her claim. 42 U.S.C. § 423(a)(1)(A). *See Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998). The relevant period for her claim, therefore, is from April 12, 2004, to September 30, 2005.

The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. § 404.1520. *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). He found Moore was impaired by chronic liver disease, fibromyalgia, depression, generalized anxiety disorder, personality disorder, and a history of alcohol abuse. Admin. R. 20. He assessed Moore with the residual functional capacity ("RFC") to perform the exertional demands of light work, with additional restrictions precluding prolonged standing or walking or concentration on complex tasks, and permitting her to change position after sitting or standing for 30 minutes. *Id.* at 23. The ALJ reached the conclusion at step five of the decision-making process that Moore's RFC during the relevant period left her able to perform work that exists in the national economy. *Id.* at 28.

Moore contends the ALJ's RFC assessment was flawed and did not accurately reflect her functional limitations. The RFC assessment describes the work-related activities a claimant can do on a sustained, regular, and continuing basis, despite the functional limitations imposed by her impairments. 20 C.F.R. § 404.1545(a). The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184*5. Moore contends the ALJ failed to properly evaluate her subjective assertions of limitations and restrictions. She challenges the ALJ's evaluation of the opinion of Randy Olander, Ph.D., a mental health care provider.

2 - FINDINGS AND RECOMMENDATION

The court reviews the Commissioner's decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Under this standard of review, the court must uphold the Commissioner's findings of fact, provided they are supported by substantial evidence in the record as a whole, including inferences logically flowing from such evidence. *Batson*, 359 F.3d at 1193; *Andrews v. Shalala,* 53 F.3d 1035, 1039-40 (9th Cir.1995); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999); *Tommasetti v. Astrue*, 553 F.3d 1035, 1040 (9th Cir. 2008).

## I.    Credibility Determination

Moore alleged her ability to work was limited by chronic pain and fatigue resulting from fibromyalgia, depression, insomnia, liver disease, and migraines. Admin. R. 76. She worked part-time as a pharmacy technician for a number of years ending in January 2001, when she was laid off for excessive absences. *Id.* at 98. Moore testified that she could not have worked full-time because of aches and pains, fatigue, and depression and that she typically missed work about once or twice per month because of illness. *Id.* at 661, 674. She has not performed substantial gainful activity since that time. *Id.* at 118.

Moore testified that her activities were extremely limited during the relevant period. She slept during the morning hours, then would try to do something for an hour or two and then would sit and watch television or lay back down. *Id.* at 664-65. She testified that in the course of a typical day she would stay in bed all day due to fatigue, frustration, irritation, and depression. *Id.* at 666. Her boyfriend did most of the household chores and Moore did the shopping. *Id.* at 671. Moore testified that with activity, she would get shaky and feel that she was going to pass out. *Id.*

3 - FINDINGS AND RECOMMENDATION

The ALJ accepted that Moore suffered from fibromyalgia, depression, generalized anxiety disorder, and personality disorder, and experienced chronic aches and pains and some degree of fatigue. The ALJ accepted that these conditions imposed significant limitations on Moore's exertional capacity and precluded prolonged standing or walking and concentration on complex tasks. *Id.* at 20, 23-25. The ALJ did not believe Moore's assertions of functional limitations exceeding those in the RFC assessment or that her aches, pains, and other symptoms precluded work with appropriate limitations on a full-time basis.

An ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). The ALJ must make findings that are sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Tommasetti*, 533 F.3d at 1039. The ALJ may consider objective medical evidence, the claimant's treatment history, daily activities, and work record, and the observations of treating sources and third parties with personal knowledge of the claimant's functional limitations. 20 C.F.R. § 404.1529(c); *Tommasetti*, 533 F.3d at 1039; *Smolen v. Chater*, 80 F.3d 1373, 1284 (9th Cir. 1996); SSR 96-7p, 1996 WL 374186.

The ALJ considered proper factors in reaching his credibility determination. He noted that the objective medical evidence did not support the degree of limitation Moore claimed. Admin. R. 25. For example, Moore had a history of a fatty liver with associated complaints of upper quadrant abdominal pain. Her subjective complaints continued despite objective evidence showing the liver condition was benign and had resolved. In October 2003, Moore had a normal CT scan of the abdomen. *Id.* at 269, 272. An MRI was also normal. *Id.* at 166, 265. She then had laboratory tests for tumor markers, and they were also normal. *Id.* at 165. In August 2004, James Theen, M.D.,

4 - FINDINGS AND RECOMMENDATION

reviewed multiple laboratory tests which were normal except one liver function test which was barely elevated and appeared trivial. *Id.* at 172-80. Atif Zaman, M.D., then evaluated Moore for liver disease at the OHSU Hepatology Clinic and diagnosed mild benign steatosis which had resolved with weight loss and a decrease in alcohol consumption. Dr. Zaman recommended exercise, proper diet, and avoidance of alcohol. *Id.* at 200, 202-03. In February 2005, Moore's liver was doing quite well. *Id.* at 191-92. The ALJ could reasonably find this medical evidence suggested a benign condition that could easily be treated with regular exercise and avoidance of alcohol. He could reasonably find the medical evidence did not fully support her ongoing complaints of abdominal pain from liver disease.

Moore alleged other severe symptoms to her physicians which objective medical evidence showed to be relatively minor ailments. For example, Moore alleged she could not work due to ongoing low back pain. *Id.* at 220, 257, 264, 271. Contemporaneous x-ray images of the lumbar spine were normal. *Id.* at 255. Follow up diagnostic images in January 2007 showed only minimal degenerative changes. *Id.* at 416-19. Similarly, Moore complained of chest pain, but contemporaneous chest x-rays were normal and her electrocardiogram was normal except that her aerobic capacity was impaired by deconditioning. *Id.* at 221-22, 226, 234. Moore's primary care provider, Mark Herscher, D.O., indicated Moore tended to have multiple somatic complaints without objective organic findings. *Id.* at 220, 242.

In September 2004, in the course of evaluating Moore's liver, Dr. Zaman ordered laboratory tests for autoimmune diseases. Although all other testing was normal, Dr. Zaman obtained an abnormal ANA test result. Dr. Zaman recommended a rheumatology evaluation to rule out autoimmune diseases. *Id.* at 200. Atul Deodhar, M.D., performed the rheumatology evaluation in

January 2005. Extensive testing for organ specific autoimmune disease and systemic lupus revealed no evidence of those diseases. Based on Moore's subjective symptoms of multiple tender points without evidence of joint abnormality or autoimmune disease, Dr. Deodhar settled on a diagnosis of fibromyalgia, although this did not account for the ANA test result. He recommended treatment with NSAIDs, antidepressant medications, counseling, trigger point injections, and exercise. *Id.* at 193.

Dr. Herscher followed-up these recommendations by prescribing antidepressant medication, daily exercise, and support group counseling. He referred Moore to Polly Sepulvado, M.D., for trigger point injections. *Id.* at 219-20. In April 2005, Dr. Sepulvado indicated Moore received good relief from trigger point injections. Dr. Sepulvado recommended regular exercise, pacing of chores, good sleep, and stress management for control of her symptoms. *Id.* at 307-08.

In May 2005, Anthony Glassman, M.D., a rehabilitation specialist, evaluated Moore for pain management and definitive treatment for fibromyalgia. He found Moore independent in her activities of daily living. Her walking caused some pain but was unlimited. Her gait was normal and she could heel and toe walk without difficulty. She had full muscle strength in all muscle groups tested. Moore exhibited no pain behavior and had no difficulty, standing, turning, or dressing. Dr. Glassman opined that aerobic exercise would be the most beneficial thing for her. He prescribed pool therapy and aqua aerobics 3 to 5 times per week and made his pain medication prescription contingent on her agreement to engage in those activities. *Id.* at 207-08. Moore reported to Dr. Herscher that trigger point injections had left her feeling much better and that most of her pain was gone. *Id.* at 217. In July 2005, Moore appeared robust but had muscle spasms in the lumbar region

which she reportedly aggravated while moving. Dr. Sepulvado instructed Moore to use good lifting mechanics while moving. *Id.* at 306.

The ALJ considered this medical evidence from Drs. Zaman, Deodhar, Herscher, Sepulvado, and Glassman and reasonably concluded that it supported a fibromyalgia diagnosis, but did not establish specific functional limitations. None of these physicians indicated Moore should avoid work or limit her activities. Indeed, they uniformly recommended that she increase her activity level and engage in aerobic activities. In addition, Moore reported significant relief from treatment. The ALJ could reasonably draw an adverse inference as to the credibility of Moore's testimony that her medical condition left her essentially bedridden.

This treatment history reflects that Moore was extensively evaluated by numerous specialists and provided each with a comprehensive history and description of her symptoms. Yet, as noted by the ALJ, she did not report that she typically stayed in bed all day due to her symptoms or became shaky and felt she would pass out with any activity. The ALJ could reasonably draw an adverse inference as to credibility from this inconsistency between her contemporaneous treatment reports and her later testimony.

The treatment record shows Moore was reluctant to accept medical advice and persistently engaged in self diagnosis. For example, in June 2004, she told Dr. Herscher she had read an internal medicine book and believed she had "classic hypothyroid symptoms." *Id.* at 256. Further evaluation revealed no thyroid problem. In January 2005, Moore told Dr. Deodhar she had done some investigation on her own and believed she had symptoms of systemic lupus. *Id.* at 195. As noted previously, systemic lupus was ruled out after extensive laboratory testing. Despite comprehensive evaluations by various specialists, Moore continued to insist she had "something really wrong" and

7 - FINDINGS AND RECOMMENDATION

felt "like she [was] dying." *Id.* While Moore may sincerely hold the conviction that she has disabling symptoms, her persistent claims have been contradicted by the medical evidence and the ALJ reasonably found them unreliable.

The ALJ noted Moore failed to comply with treatment recommendations. *Id.* at 26. When evaluated for anxiety treatment in May 2002, Moore was described as "resistant to anything but her own ideas for treatment." *Id.* at 595. She underwent mental health counseling for a year and responded well to therapy. At discharge in April 2003, Moore reported decreased irritability and anxiety symptoms, and her mental health counselor rated her global assessment of functioning at 70, indicating only mild symptoms. *Id.* at 547-48. Despite alleging debilitating depression and anxiety and despite recommendations that counseling should be part of her treatment for fibromyalgia, Moore did not obtain mental health care again until 2007. *Id.* at 542. Moore testified that she chose not to pursue counseling after her therapist moved out of town because she did not want to switch counselors. *Id.* at 665-66. When she resumed counseling, she resisted the treatment plan recommended by Randy Olander, Ph.D., asserting Dr. Olander did not understand what kind of therapy she needed. *Id.* at 537. Similarly, Moore did not engage in exercise as recommended by her treating physician and all the specialists who evaluated her fibromyalgia. She testified she was unwilling to engage in pool therapy or aqua aerobics because she lived far from the pool and did not want to swim "with a million children in chlorinated water." *Id.* at 669. She had brief trials on at least 9 antidepressant medications, but discontinued each because she did not like the way any of them made her feel. *Id.* at 209, 219, 308.

When a claimant makes subjective statements about disabling symptoms, but fails to comply with prescribed treatment, an ALJ may reasonably find the subjective statements unjustified or

8 - FINDINGS AND RECOMMENDATION

exaggerated. *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007). An ALJ may draw an adverse inference as to credibility from a claimant's failure to seek or follow treatment for allegedly disabling symptoms. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001). It is reasonable to expect a person experiencing disabling symptoms to attempt to comply with treatment designed to alleviate those symptoms, even if compliance entails inconvenience or tolerable side effects. Accordingly, the ALJ could reasonably draw an adverse inference as to Moore's credibility from her refusal to comply with the various treatments prescribed for her.

The ALJ also believed Moore engaged in a level of activity that was inconsistent with the limitations she claimed. Admin. R. 25, 26. Based on her subjective history, Dr. Glassman noted that she was independent in her activities of daily living. *Id.* at 207. Her written submissions and the third party statements indicate that she prepared simple meals, drove a car, shopped for groceries, and performed limited household chores. *Id.* at 111-13, 133-36. Moore reportedly developed back spasms from moving her household. *Id.* at 306, 550. While these activities are not equivalent to the sustained activities required for full-time work, they are inconsistent with Moore's testimony that she typically spends all day in bed. The ALJ also noted that Moore considered relocating to Los Angeles where she thought her job opportunities would be better. He could infer that she did not consider herself unable to work while considering those plans. Viewed in context with the record as a whole, the ALJ could rationally draw an adverse inference as to Moore's credibility from this evidence.

The ALJ also reviewed Moore's work history. Although Moore claimed she had lost a lot of jobs due to illness, the record shows she quit her last job in California after a dispute with new owners of the company, and previous jobs ended for reasons unrelated to disability. *Id.* at 98, 660.

9 - FINDINGS AND RECOMMENDATION

In summary, the ALJ considered proper factors in making his credibility determination. His reasoning is based on inferences reasonably drawn from the record as a whole and sufficiently specific for this court to conclude that he did not discredit Moore's testimony arbitrarily. Under these circumstances, the court must uphold the ALJ's findings of fact, even if the evidence could also rationally be interpreted as Moore urges. *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039-40; *Morgan*, 169 F.3d at 599.

## II. <u>Medical Source Statement</u>

Dr. Olander first met Moore in April 2002 and saw her in individual psychotherapy sessions through July 2002. Admin. R. 577-78, 631. He did not see Moore for nearly five years, until she returned in April 2007, reporting severe symptoms of depression. *Id.* at 631. In October 2007, Dr. Olander wrote a disability opinion letter, stating:

> Her extreme lack of energy and motivation blended with chronic difficulties in concentration and task completion would set her up for failure in pretty much any current job experience that comes to mind. If this is factored into her chronic physical disorders, one would be hard pressed to forecast an acceptable level of success in a work setting where she would be required to maintain adequate attendance, productivity and performance. Additionally, her inability to control mood shifts and tolerate all but minimal levels of stress would sabotage any positive work relationships required to hold a job for any conventional amount of time. If she was hired to do the least stressful of jobs, her uncontrolled emotional displays would be seen by most supervisors as unacceptable and the client would either be fired or asked to resign... Given the above I would recommend that Ms. Moore be granted disability benefits due to her history of chronic and persistent symptoms which makes her mentally unstable and heretofore has been treatment resistant for the most part.

*Id.* at 632-33.

The ALJ accepted Dr. Olander's opinion that Moore had severe mental impairments, but did not accept his conclusion that she was disabled within the meaning of the Social Security Act. *Id.* at 26. The questions of whether a claimant is employable or entitled to benefits are not medical opinions about specific functional limitations, but administrative findings which the regulations reserve to the Commissioner. Opinions on issues reserved to the Commissioner cannot be given special significance, even when offered by a treating source. 20 C.F.R. § 404.1527(e); SSR 96-5p, 1996 WL 374183, *2-3. Dr. Olander's statements that he thought Moore should be granted disability benefits and that Moore's emotional behavior would be unacceptable to most supervisors are not psychological opinions within his expertise, but administrative findings requiring vocational information and expertise. The ALJ properly gave those conclusions no special significance.

Dr. Olander was not a licensed or board certified psychologist when he treated Moore. Admin. R. 630. Accordingly, under the regulations, he was not an acceptable medical source whose opinion could establish disability or the existence of an impairment. 20 C.F.R. § 404.1513(a)(2). Dr. Olander fell within the regulatory definition of "other source" and his opinion was entitled to consideration as evidence of the severity of Moore's impairment. 20 C.F.R. § 404.1513(d). An ALJ must consider the observations of such sources as to how an impairment affects the claimant's ability to work. *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). He may not discount the statements of such sources without giving reasons germane to the witness. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). The ALJ was not required to provide clear and convincing reasons to discount the opinions of such sources, however.

The ALJ pointed out that Dr. Olander did not treat Moore during the relevant period of time. Admin. R. 25-26. He saw Moore for a total of 3 months in 2002, ending over a year and a half

11 - FINDINGS AND RECOMMENDATION

before the alleged onset of disability. He then saw her again for a total of 9 sessions in 2007, beginning over a year and a half after Moore's insured status expired. *Id.* at 631. The ALJ could reasonably expect a claimant experiencing debilitating mental health issues to seek treatment. He could reasonably infer that she did not seek treatment during the five year interim because her symptoms were not debilitating during that time. *See Bruton*, 268 F.3d at 828. This is particularly true in Moore's case because she had reported great benefit from treatment in the past and had been discharged from treatment in April 2003, with only mild symptoms. *Id.* at 547-48. The ALJ could reasonably find this history of successful treatment inconsistent with Dr. Olander's assertion that Moore's mental disorder was treatment resistant. He could reasonably conclude Moore was treatable, that her symptoms abated with treatment by April 2003, and did not recur until she sought treatment again in April 2007, long after her insured status expired.

The ALJ also relied on Moore's work history. Although Dr. Olander opined she would engage in emotional behavior that most supervisors would find unacceptable, her work history did not include such incidents in work settings. *Id.* at 98, 660. She did not make contemporaneous reports of uncontrolled emotional displays at work to any treating source. She did not claim to have been terminated for such displays.

In summary, the ALJ considered Dr. Olander's opinion and gave sufficient reasons for discounting his assertion that Moore is disabled by her mental impairments. His reasons reflect a rational interpretation of the evidence in the record and his determination should be upheld. Even if the evidence could be reasonably interpreted as Moore contends it should have been, the court must uphold the Commissioner's rational findings of fact. *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039-40; *Morgan*, 169 F.3d at 599.

12 - FINDINGS AND RECOMMENDATION

The ALJ drew reasonable inferences from permissible factors in executing his responsibility for determining credibility, evaluating the medical evidence, and resolving conflicts in the evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Accordingly, the ALJ's determination should be affirmed.

## RECOMMENDATION

Based on the foregoing, the ALJ's decision that Moore did not prove disability during the relevant period of time and is not entitled to disability insurance benefits under Title II of the Social Security Act is based on correct legal standards and supported by substantial evidence. The Commissioner's decision should be affirmed.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due ten days from today. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

DATED this 12th day of August, 2009.

Thomas M. Coffin
United States Magistrate Judge